MEMORANDUM OF DECISION RE ORDER OF TEMPORARY CUSTODY
On February 6, 1998, the Department of Children and Families, hereafter "DCF", filed an application for an order of temporary custody and a neglect petition concerning William B., IV, then a day shy of his seventh birthday, pursuant to Connecticut General Statutes § 46b-129 (B). DCF alleged that William was in immediate physical danger from surroundings and that immediate removal from such surroundings was necessary to insure his safety. William had been brought to the local hospital during a severe asthma attack around 2 A. M. on January 30, 1998 and his father appeared to be intoxicated. An ex-parte order of temporary custody was signed on February 6, 1998. (Peck, J.). On February 11, 1998, the parents appeared in court, pro forma denials were entered and counsel appointed for the father. Mother's counsel appeared on that day. The matter was continued until February 26, 1998 when a fully contested hearing on the temporary custody order commenced, which was concluded on March 6, 1998.
All counsel and the mother and father appeared for the two days of hearing. The court finds that the parents were served and that it has jurisdiction in this matter. The court heard the testimony of witnesses including from the father of William, William B., III, and admitted several documents into evidence. DCF also moved at the close of the hearing for orders for psychological evaluations of the parents. The court orders that these motions be docketed before the court on March 19, 1998 in the Superior Court for Juvenile Matters in Rockville, where the CT Page 2657 next hearings are now scheduled.
The court makes the following findings by a preponderance of the evidence.
William B., IV has suffered from asthmatic attacks during his childhood and required the care of a pediatric pulmonary specialist, according to testimony given by his father. From the testimony of the investigative DCF worker, the court finds that two days earlier, William's school nurse had called, not for the first time, seeking his medication and nebulizer, as William was not doing well in school. One of William's sisters brought the medication and equipment, although some of the tubing was missing. The day before William's arrival at the hospital, William stayed home from school because of his asthmatic condition. His father testified that his son received a treatment before going to bed and when he himself went to bed, the child was sleeping as were the other two children in the household, his two older daughters. William then came in the night to wake him up and they left for the hospital.
William's parents are divorced and there are various protective orders existing between them. All parties acknowledge that William's mother, Jayne B., does not have custody of the child. While the child's father vehemently denies that the mother was there that night, William himself reported that she was in the bedroom with his father. The two daughters, according to the testimony of the investigative worker, were evasive about their mother and her whereabouts, but denied that she was there. Nonetheless, the court concludes by a fair preponderance of the evidence that the mother was present that evening.
Both the nurse in the emergency room and the physician, Dr. Holmes, who treated William, were unequivocal that William's father was intoxicated when he arrived with his son. Dr. Holmes stated that Mr. B.'s face was flushed, his speech slurred, his gait unsteady and that he was somewhat confused in answering questions. The nurse reported he had a strong odor of alcohol on his breath. These observations are also set forth in the medical records and the court concludes that the child's father was intoxicated.
Whether or not William's father delayed in getting the child medical attention cannot be answered with any certainty. Nonetheless, Williams' father reported that while he was driving CT Page 2658 his son to the hospital, his son told him it was serious and that he would die if they did not get to the hospital. This is not a usual statement for a child to make. Also, the failure of the family to get the medication to William's school without repeated calls and then not in complete form adds credence to the lack of attention being paid to William's medical care. From this and the testimony of the professionals, the court concludes that the father did not understand the severity of his son's condition that night, although there is no doubt he was concerned and took appropriate action to save his son's life.
When William arrived, Dr. Holmes testified the child was in respiratory extremis. His lips were blue and he was breathing very rapidly. The child was anxious, confused and fighting for every breath. The physician prepared to intubate him. Fortunately, with the use of the bronchial dilator and the administration of intravenous inflammatory medication, the child stabilized after about fifteen minutes. Dr. Holmes agreed that if the child had been brought in five minutes later, he could have died.
From the testimony, the court also concludes that William B., III, the father, smoked in the house and that there were pets in the home. Smoking is known to be counter-indicated when asthmatics reside in the home and pet dander is problematic, in particular if the asthmatic is allergic to dander, as many asthmatics are. Both the hospital emergency room nurse and physician testified to these facts. There was also concern about William's medication and the Albuteral that his father showed the DCF worker was outdated. Using such outdated medication, all agree, reduces its effectiveness. Other medications, whose effective use dates had not expired, were also on hand to ameliorate William's asthmatic condition. While there was no testimony offered as to what medication was used on William the night of the attack, the court concludes there was some reason to be concerned about his medications.
Since the date William was removed from the home, his father has cooperated with DCF, submitted to urine analyses, and had an Advanced Behavioral Health evaluation. As a result of the evaluation, he is in counseling with more intense treatment than before. He has had visitation with his son and has stopped smoking, removed the pets from the house and begun to consider how better to ventilate the home. The court acknowledges his sincere efforts and states the need for such efforts to continue. CT Page 2659
While the asthma from which William suffers had remained under control until January 30, 1998, his father's failure to remain sober and consequently to be limited in his ability to provide for his son's care under those circumstances placed the child in a life-threatening situation. The relaxed attitude to the medications and the school's need for them have previously been articulated. His mother's presence in the home on this night, given his extreme distress, and her acquiescence in permitting his intoxicated father to transport him to the hospital, also placed the child in danger.
The court concludes from a fair preponderance of the evidence that the allegations made by DCF have been proven. The court may issue an ex-parte order of temporary custody in cases of an alleged neglected, abused or uncared-for child upon an application supported by a sworn statement alleging such facts that support a finding of probable cause to believe that a child is in immediate danger from its surroundings and that immediate removal from those surroundings is necessary to ensure the child's safety. After issuance of these ex-parte orders, a court hearing is scheduled within ten days of the issuance of the order to hear the sole issue of the continuing need for protective custody until a full hearing is held on the merits of the neglect petition. Connecticut General Statutes § 46b-129 (b).
The court notes that orders of temporary custody are intended to protect children during urgent situations where their physical health and safety are jeopardized. If the urgent situation no longer exists, the order should be vacated, and custody of the child restored to the parent or guardian. In re Juvenile Appeal
(83-CD), 189 Conn. 276, 455 A.2d 1313 (1983). Further, the governing standard of proof at any court hearing on temporary custody is a "fair preponderance of the evidence." The burden of proof rests with the petitioner, DCF, in the present case.
The court concludes, from the evidence, that DCF has proved by a fair preponderance of the evidence that the minor child, William B., IV was on January 30, 1998 and continues to be in immediate physical danger from his surroundings, should custody be returned to his father and should he be allowed to reside with him. While remedial measures were taken by his father, the issue of alcohol abuse remains.
The Court is optimistic that this situation will change in the CT Page 2660 near future, as William B., III continues to co-operate with the support services being offered to him. Reunification efforts are underway. However, given the father's belief that the DCF investigator has fabricated evidence, including compelling the statements of the hospital personnel to remove William from him, the court is not presently convinced that the issue of alcohol abuse has been adequately addressed or that he is ready and willing to co-operate in accepting these services. Despite the fact that the mother is not the custodial parent, her apparent presence in the home and her involvement with the family also remains unclarified, not to mention the criminal cases now pending against both parents.
Based on all of the foregoing, the court confirms the order placing temporary custody of William B., IV with the Commissioner of the Department of Children and Families.
Barbara M. Quinn Judge, Child Protection Session